## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) | MITCHELL GARRETT, as Special Administrator for the ESTATE OF BRIAN BONNER, | |
| | Plaintiff, | |
| v. | | Case No.: 26-cv-00422-CDL **ATTORNEY LIEN CLAIMED** |
| (1) | UNIVERSAL PROTECTION SERVICE, LP, d/b/a ALLIED UNIVERSAL SECURITY SERVICES, | **JURY TRIAL DEMANDED** |
| (2) | CITY OF TULSA, a municipal corporation, | |
| (3) | WESTON HARDIN, in his official and individual capacities, | |
| (4) | JOHN AND/OR JANE DOES, in their individual capacities | |
| | Defendants. | |

## COMPLAINT

Mitchell Garrett, as Special Administrator for the Estate of Brian Bonner, deceased, submits this Complaint against the above-named Defendants.

### I.

### PARTIES, JURISDICTION, VENUE

1. Plaintiff, Mitchell Garrett, is a resident and citizen of Oklahoma and the court-appointed Special Administrator of the Estate of Brian Bonner, deceased. Plaintiff brings this

action on behalf of the Estate and the statutory beneficiaries of Brian Bonner pursuant to 12 O.S. §§ 1053–1054.

2.    Defendant Universal Protection Service, LP, d/b/a Allied Universal Security Services (Allied), is a California limited partnership engaged in the for-profit business of private security and detention services. At all relevant times, Allied operated the Tulsa Municipal Jail (Facility), located at 600 Civic Center, Tulsa, Oklahoma, pursuant to a written Agreement for Lockup Facility Operations and Management Services with the City of Tulsa (Agreement).

3.    In exchange for taxpayer funds approaching $3 million annually, Allied assumed responsibility for the complete management and operation of the Facility twenty-four hours a day, seven days a week, including, without limitation, the intake and medical screening of arrestees, the day-to-day care, custody, and security of detainees, hourly welfare checks of all detainees, the provision of non-emergency medical care through telehealth services, and the staffing, training, and supervision of all detention personnel.

4.    Under the Agreement, Allied was required to provide personnel experienced in their respective fields, to perform its services consistent with the standards of care, diligence, and skill ordinarily exercised by professionals in similar fields, to "provide and maintain adequate staffing to operate the Facility in a safe and efficient manner," and to staff the Facility with no fewer than sixteen detention officers and three lead officers in each twenty-four-hour period.

5.    In operating the Facility, Allied performed a function traditionally and exclusively reserved to the state, the incarceration of persons arrested by law enforcement, and at all relevant times acted under color of state law. Allied is subject to suit under 42 U.S.C. § 1983.

6.    At all times relevant to the allegations below, Allied's employees and agents including the John and Jane Does yet to be identified, acted within the scope of their employment

and pursuant to the written policies and unwritten customs and practices adopted, enforced, ratified, and maintained by Allied.

7.    Plaintiff served Allied with written notice of this claim pursuant to 57 O.S. § 566.4 on October 21, 2025. More than ninety days have elapsed, and Allied has taken no action on the notice. All conditions precedent to suit against Allied have been satisfied or do not apply.

8.    Defendant Weston Hardon (Hardon) is, upon information and belief, a resident and citizen of Oklahoma. At all relevant times, including February 2025, Hardon was employed by Allied as the Jail Administrator of the Facility. Hardon is sued in his individual capacity.

9.    As Jail Administrator, Hardon was responsible under the Agreement for the management and administration of detention services at the Facility, directly supervised all Allied personnel assigned to the Facility, and was responsible for ensuring that all personnel had the necessary knowledge, training, and equipment. Hardon exercised final decision-making authority over the day-to-day operational practices of the Facility, including intake acceptance decisions, detainee monitoring, and access of detainees to emergency medical care, and his decisions in those areas were unreviewable and constituted the operative policy of Allied at the Facility.

10.    Hardon, a former Tulsa Police Department officer, was issued and used an email address bearing the suffix @cityoftulsa.org in his capacity as Jail Administrator while employed by Allied, and under the Agreement reported directly to the Administrative Chief of the Tulsa Police Department. At all relevant times Hardon functioned as the joint agent and instrument of both Allied and the City in the administration of the Facility.

11.    Defendant City of Tulsa (City) is an Oklahoma municipal corporation. The City owns the Facility, solicited and selected Allied as its contractor through a request-for-proposals process, and compensated Allied with public funds for the operation of the Facility.

3

12.    The City did not delegate, and could not delegate, its constitutional obligations to persons detained at the Facility. Under the Agreement, the City expressly retained "administration and control of the Facility" through the Administrative Chief of the Tulsa Police Department or his designee; authored and promulgated the City of Tulsa Municipal Jail Policies and Procedures governing Facility operations; promulgated the medical intake guidelines and medical screening questionnaire used to determine whether arrestees were medically fit for booking; retained approval authority over Allied's training programs and telehealth policies and provider; retained the right to review use-of-force incidents and direct personnel discipline; retained exclusive authority over the release of detainees; and provided and maintained the Facility's physical plant, including its video surveillance systems.

13.    The constitutionally deficient policies, customs, and practices alleged herein were policies, customs, and practices of both Allied and the City: Allied as their day-to-day author and enforcer, and the City as their promulgator, supervisor, and ratifier through the oversight structure the City created and retained.

14.    The events complained of occurred in Tulsa County, Oklahoma. This is an action for the deprivation of rights secured by the Fourteenth Amendment to the United States Constitution, brought pursuant to 42 U.S.C. § 1983, together with supplemental state-law claims. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367, and venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

15.    Plaintiff has timely complied with all prerequisites to filing suit, including service of the notice described in Paragraph 7 upon Allied.

**II.**

**STATEMENT OF FACTS**

A.      **IN-CUSTODY DEATHS FROM PREVENTABLE MEDICAL CONDITIONS ARE A CHRONIC AND WELL-KNOWN PROBLEM IN PRETRIAL DETENTION**

16.     The prior paragraphs are adopted by reference and incorporated herein.

17.     According to the United States Department of Justice, Bureau of Justice Statistics, the number of deaths in local jails and lockup facilities increased by 33% between 2000 and 2019.

18.     Illness is the leading cause of death in these facilities, ahead of suicide, homicide, and drug intoxication.

19.     The majority of illness-related deaths are attributable to conditions that are treatable if identified and managed through adequate medical screening, monitoring, and timely intervention.

20.     The risk of preventable in-custody death is most acute during the first days of detention, when the effects of untreated illness, intoxication, withdrawal, and mental health crisis are at their peak. These risks are well known to any entity in the business of operating detention facilities.

21.     Acute epiglottitis is a rapidly progressing infection of the epiglottis and surrounding tissue that causes airway obstruction. It is a medical emergency that is treatable with timely airway management, intravenous antibiotics, and monitoring. Without timely intervention, the patient dies from airway obstruction.

22.     Acute epiglottitis does not develop instantaneously. It progresses over hours, producing observable symptoms including wheezing, sore throat, difficulty swallowing, drooling, muffled or hoarse voice, fever, and increasing respiratory distress.

5

23.    In a community setting, a person experiencing these symptoms would present to an emergency room or call 911. In a lockup facility, the person's only access to medical care depends entirely on the training, attentiveness, and responsiveness of detention staff.

**B.    THE CITY DESIGNED A JAIL WITH NO MEDICAL CARE TO SAVE MONEY, KNOWING THE RISK**

24.    The prior paragraphs are adopted by reference and incorporated herein.

25.    Before 2018, the City contracted with Tulsa County to house municipal arrestees at the David L. Moss Criminal Justice Center (DLMCJC), a facility with on-site medical staff and a dedicated housing pod for detainees with mental illness.

26.    In 2017, when Tulsa County sought to increase the price of housing municipal arrestees, the City elected to open its own facility rather than pay the increased cost. The City's then-Mayor publicly described the choice as a "business decision."

27.    The Facility the City opened is a windowless, underground lockup located inside a parking garage beneath the downtown civic center. It has no on-site medical staff. Medical screenings at intake are performed by detention officers with no medical training or licensure.

28.    The City's then-Deputy Mayor acknowledged the tradeoff publicly in 2018: "You really don't want a jail or a lockup facility that saves a ton of money because then you are going to pay for it in increased liability."

29.    From the Facility's opening, the City knew that detainees' access to medical care depended entirely on contract detention staff identifying medical needs and summoning outside emergency responders.

30.    In 2023, the City added a telehealth contract for non-emergency medical care. The City's Police Department reviewed and approved the telehealth policies and the provider, and the

City retained the unilateral right to terminate the service. At no time did the City place medical personnel in the Facility. Brian Bonner died waiting for a telehealth appointment.

### C.    STATE INSPECTORS REPEATEDLY FOUND THE FACILITY OUT OF COMPLIANCE

31.    The prior paragraphs are adopted by reference and incorporated herein.

32.    The Oklahoma State Department of Health (OSDH) is responsible for inspecting jail and lockup facilities in Oklahoma, including the Facility.

33.    On July 14, 2022, OSDH found the Facility not in substantial compliance, citing fire prevention deficiencies.

34.    On March 26, 2024, OSDH substantiated a complaint received the day after the death of Jeffery Mansell (D-2023-017) and cited the Facility for deficiencies. OSDH found that Mr. Mansell was under the influence at book-in and was nonetheless moved from a holding cell into a general population cell with other detainees, in violation of the Facility's own written policy implementing the separation requirement of OAC 310:670-5-5(5).

35.    OSDH opened complaint investigations on the dates of the deaths of Jeffrey Fetterhoff, Afrika Carey, and Brian Bonner (D-2024-036, D-2024-038, D-2025-006); in two of the three, the complainant of record was the Facility's own Jail Administrator. OSDH conducted all three investigations on a single day, April 14, 2025. In each, OSDH interviewed one witness— the facility administrator—interviewed no medical staff and no detainees, and closed the investigation with a finding of "no deficiencies."

36.    OSDH investigated the two most recent deaths the same way. Conor Spencer hanged himself in his cell on August 27, 2025, and died two days later; OSDH did not conduct its investigation until February 3, 2026, more than five months later, and, although it reviewed the Facility's suicide-watch log and mental-health screening records, cited no deficiencies and found

the Facility in substantial compliance, notwithstanding that Mr. Spencer had never been placed on suicide watch. OSDH treated the death as falling outside the Facility's custody, on the ground that Mr. Spencer had been released on his own recognizance before he died at the hospital, and it made no referral to law enforcement, the OSBI, or a district attorney. Justin Benner died on September 19, 2025, approximately one hour after Facility staff placed him in a full-body WRAP restraint in a booking-area holding cell; OSDH did not conduct its investigation until December 5, 2025. Consistent with its investigations of the Fetterhoff, Carey, and Bonner deaths, OSDH interviewed a single witness, the Facility's administrator, interviewed no medical staff, no detention staff, and no detainees, selected a sample of zero inmates, and recorded no allegations and no findings.

37.    Each OSDH death investigation and compliance finding was communicated to Allied. Under the Agreement, Allied was required to notify OSDH immediately upon any inmate death, and the Jail Administrator was responsible for management of the Facility consistent with Oklahoma Health Department requirements. Both Allied and the City knew of each finding when made.

D.    SEVEN PEOPLE DIED AT THE FACILITY IN THREE YEARS UNDER ALLIED'S OPERATION

38.    The prior paragraphs are adopted by reference and incorporated herein.

39.    Since January 2023, seven people have died at, or immediately after being removed from, the 70-bed Facility while Allied operated it. Based on national mortality data from the Department of Justice, a facility of this size would be expected to experience approximately one death every ten to fifteen years.

40.    Eva Darline Pickle (January 14, 2023, age 48), died from hypertensive cardiovascular disease complicated by methamphetamine toxicity. She was found dead in her cell. Ms. Pickle was not housed in the Facility's sobering area.

41.     Jeffery Glen Mansell (May 31, 2023, age 56), died from hypertensive atherosclerotic cardiovascular disease complicated by methamphetamine toxicity. Mr. Mansell was not housed in the Facility's sobering area.

42.     Jeffrey Fetterhoff (October 11, 2024, age 23), died from suicide by hanging. Mr. Fetterhoff had been discharged from a mental hospital two days before his arrest and was not placed on suicide watch.

43.     Afrika Fulani Carey (December 7, 2024, age 36), died from complications of methamphetamine toxicity. Found dead at 5:30 a.m. Ms. Carey was not housed in the Facility's sobering area.

44.     Brian Bonner (February 17, 2025, age 38), died from acute laryngo-epiglottitis. Found unresponsive in a single-occupant cell more than three hours after surveillance cameras recorded him wheezing and gasping for air.

45.     Conor Spencer (August 29, 2025, age 33), died from suicide by hanging. Jail staff had contacted Mr. Spencer's mother days earlier because his behavior was so erratic that his court date was moved. He was not placed on suicide watch.

46.     Justin Spencer Benner (September 19, 2025, age 48), died from sudden cardiac death in the setting of hypertensive cardiovascular disease, restraint, and trauma. Mr. Benner died approximately one hour after being placed in a full-body restraint device, or WRAP.

47.     The deaths preceding February 17, 2025 placed Allied, Hardon, and the City on actual notice of the lethal consequences of the Facility's intake process, monitoring, staffing, and medical care practices. The deaths following February 17, 2025 are alleged as evidence that the customs and practices that killed Brian Bonner were persistent, systemic, widespread, and uncorrected, and that Defendants ratified rather than remedied them.

48.    The City's Police Department investigated each death itself, found no wrongdoing in any of them, stopped issuing press releases concerning deaths at the Facility in 2023, and denied public records requests concerning all seven. No death resulted in any documented change to intake, staffing, monitoring, or medical care practices at the Facility.

**E.    ALLIED EMPLOYED UNLICENSED GUARDS AND WAS CITED BY CLEET**

49.    The prior paragraphs are adopted by reference and incorporated herein.

50.    The Agreement required all Allied personnel to obtain a CLEET-accredited security guard license within 90 days of assignment to the Facility.

51.    On August 29, 2023, the Council on Law Enforcement Education and Training (CLEET) cited Allied for employing an unlicensed guard.

52.    On November 2, 2023, CLEET cited Allied a second time for the same violation.

**F.    PRIOR LAWSUITS PROVIDED NOTICE OF CONSTITUTIONAL VIOLATIONS AT THE FACILITY**

53.    The prior paragraphs are adopted by reference and incorporated herein.

54.    In *Ward v. City of Tulsa*, No. 4:21-cv-00131 (N.D. Okla. 2021), Lawanda Ward, a 46-year-old paraplegic woman, died in the Facility's custody in January 2020 under Allied's predecessor, G4S Secure Solutions. The complaint alleged that jail staff denied her medical care despite repeated pleas for help over four days. Allied acquired G4S in April 2021 and assumed operation of the Facility with knowledge of the death and the litigation.

55.    In *Ahmadi v. City of Tulsa*, No. 22-CV-529 (N.D. Okla. 2022), the complaint alleged excessive force and deliberate indifference to medical needs by detention officers at the Facility.

56.    In *Morrison v. City of Tulsa*, No. 4:24-cv-00291 (N.D. Okla. 2024), Kejuana Morrison, booked for unpaid traffic tickets, alleged she was shoved headfirst into a wall and knelt

on by a detention officer, then denied medical care until a relative called 911 from outside the jail, where paramedics found her with life-threatening blood pressure. The case settled.

57.     In *Parker v. City of Tulsa*, No. 4:25-cv-00068 (N.D. Okla. 2025), the complaint alleged an assault by Allied detention officers at the Facility.

58.     The City was a named defendant in each action and had actual knowledge of each. Neither the City nor Allied changed the Facility's medical care, intake, or supervision practices in response.

### G.     STAFF AND CITY EMPLOYEES WARNED ALLIED AND THE CITY'S HIGHEST POLICE OFFICIALS, IN WRITING, THAT DETAINEES WOULD DIE

59.     The prior paragraphs are adopted by reference and incorporated herein.

60.     In January 2022, a detention supervisor resigned, identifying "unsafe" staffing levels in her resignation letter.

61.     In March 2022, detention officer Ivy Morgan submitted a detailed written complaint to then-Tulsa Police Chief Wendell Franklin and then-Deputy Chief Dennis Larsen, who is now the Chief of Police. Morgan's complaint described a "complete lack of management" at the Facility, identified specific incidents in which staff ignored detainees who needed medical attention, documented routine admission of detainees beyond the Facility's rated capacity, and attached observation logs showing detainees went unchecked for hours despite the hourly-check requirement of OAC 310:670-5-2-3. Morgan had complained repeatedly to Allied before escalating to the City.

62.     Text messages confirm that Chief Franklin and Deputy Chief Larsen received and acknowledged Morgan's complaint, and that a TPD internal affairs investigator visited the Facility in March 2022 to check staffing numbers.

11

63.     Morgan warned, in words or substance: "If this keeps happening, people are going to die. Someone's going to get hurt. The whole bottom is going to fall out."

64.     In 2022, Karen Sloan, a City of Tulsa municipal court employee, sent a written warning to both Allied and City staff regarding a suicidal woman booked into the Facility with an open, self-inflicted wound: "Why does TPD bring people like this to our jail when we DO NOT HAVE medical and mental facilities?"

65.     In April 2023, FOX23 published an investigation in which former employees described a culture of excessive force and refusal of medical care at the Facility. One stated: "I have never in my life seen people be treated the way they've been treated at that jail."

66.     Employees filed formal complaints regarding conditions at the Facility with Allied human resources, the City of Tulsa, the EEOC, and the Oklahoma Department of Labor.

67.     These warnings, from Allied's own staff, from a City employee, and through the press, reached the specific City officials in whom the Agreement vested administration and control of the Facility. They described, years in advance, the precise failure modes that killed Brian Bonner: detainees admitted who should have been refused, medical needs ignored, adequate welfare checks disregarded, and staffing below safe levels.

### H.     ALLIED PUNISHED THE EMPLOYEES WHO WARNED

68.     The prior paragraphs are adopted by reference and incorporated herein.

69.     On April 5, 2022, weeks after her complaint reached the Chief of Police, Morgan was gathering documents related to her complaint when Jail Administrator Hardon took the papers from her hand and told her it was her last night at the jail. The next day, at Hardon's request, Allied removed Morgan from her position at the Facility and reassigned her to a lower-paying position. She was never given a reason.

70.     Three former employees report that the Jail Administrator removed them from their positions after they raised concerns with Allied human resources and the Tulsa Police Department. A fourth was forced to resign and reached a settlement with Allied after filing a federal workplace retaliation complaint.

71.     As a former employee put it: "Working in the Tulsa municipal jail if you stand up and say something you don't have a job."

72.     Allied's practice of removing employees who reported unsafe conditions suppressed the flow of safety information within the Facility and ensured that the dangerous conditions described above persisted uncorrected through February 2025.

### I.     THE FACILITY WAS CHRONICALLY UNDERSTAFFED, OVERCROWDED, AND DETERRED FROM SUMMONING EMERGENCY CARE

73.     The prior paragraphs are adopted by reference and incorporated herein.

74.     The Agreement required no fewer than sixteen detention officers and three lead officers in each twenty-four-hour period. Upon information and belief, Allied routinely staffed the Facility below this contractual minimum.

75.     On March 13, 2022, the night a TPD internal affairs investigator visited the Facility to check staffing, Hardon texted detention officers: "I need communication if we drop below 4 employees in the jail."

76.     Internal photographs, booking records, and the Morgan complaint document the Facility operating above its 70-bed rated capacity.

77.     Text messages among detention staff document chronic understaffing and the inability to maintain adequate supervision of detainees, including completion of the hourly welfare checks required by state law.

78.    Upon information and belief, Hardon directed supervisors to obtain his approval before calling ambulances for detainees. In late 2021, a supervisor wrote in a text message that administrators were "having a shit fit over the hospital/ EMSA bills."

79.    The combined effect of these practices was a facility in which medically vulnerable detainees were admitted despite written criteria requiring their refusal, were not monitored as state law required, and faced an institutional barrier between themselves and emergency medical care. Brian Bonner encountered every one of these conditions in February 2025.

J.    **THE DEATH OF BRIAN BONNER**

80.    The prior paragraphs are adopted by reference and incorporated herein.

81.    Brian Bonner was 38 years old. He suffered from serious mental illness, including schizophrenia and bipolar disorder, and at the time of the events alleged he was unmedicated and experiencing homelessness in Tulsa.

82.    The Facility's staff knew Mr. Bonner. In the roughly five months before his death, Mr. Bonner was arrested and booked into the Facility on no fewer than eleven separate occasions: on September 7, October 4, October 24, November 8, November 16, and November 26, 2024, and on January 8, January 14, January 16, January 24, and February 6, 2025, nearly always on misdemeanor trespassing charges arising from his homelessness and untreated illness.

83.    The circumstances of those arrests repeatedly placed Mr. Bonner's vulnerability in plain view. He told officers more than once that he had nowhere to go, that it was cold, and that he wanted to go to jail; on one occasion an officer recorded that he "wanted to go to jail and have a pot pie." On another, an officer documented that Mr. Bonner could give only his first name and the month and year of his birth, and when asked the day he was born, "replied 'I don't know.'" By

late January 2025, an officer noted that Mr. Bonner "has been arrested/cited for trespassing 14 times prior."

84.    Each of these bookings ran through the same intake process at the Facility, staffed and operated by Allied. By February 2025, Allied and its personnel, including Defendant Hardon and the detention officers who repeatedly processed Mr. Bonner, had actual, individualized knowledge that Mr. Bonner was a vulnerable, seriously mentally ill man who cycled in and out of their custody.

85.    On February 14, 2025, Mr. Bonner was arrested again, this time for misdemeanor public intoxication, after he was allegedly found smoking in the lobby of a downtown restaurant. The arresting officer was the same Tulsa Police Department officer who had arrested Mr. Bonner eight days earlier.

86.    The arresting officer documented objective signs of a medical or neurological abnormality. He wrote that Mr. Bonner "had pupils that were not reactive to light and had difficulty remaining still," which the officer attributed to "chemical intoxication," and that "Bonner admitted to officers that he was 'high.'"

87.    The City of Tulsa operates a sobering center as the destination for persons intoxicated in public. Mr. Bonner was not taken there. The arresting officer wrote: "Bonner was not taken to the sobering center because he had been causing a disturbance at Prhyme Steakhouse." Instead of being diverted to the sobering center or cleared by a medical provider, Mr. Bonner, presenting with non-reactive pupils and an inability to remain still, was delivered to the Facility and booked into a jail cell.

88.    Mr. Bonner was booked into the Facility on the afternoon of Friday, February 14, 2025.

89. Allied's intake process required medical screening of every person booked into the Facility, including under the Medical Intake Guidelines (Exhibit B) and the Medical Screening Questionnaire (Exhibit C) to the Agreement. That screening was designed to identify, among other things, intoxication posing an immediate or future medical emergency (Exhibit B, criterion 6), current prescription medications (Exhibit C, Q1), diagnosed mental illness (Exhibit C, Q11), and current suicidal ideation (Exhibit C, Q28).

90. Allied's intake screening flagged Mr. Bonner as having a medical need. According to the Oklahoma State Department of Health's investigative report concerning Mr. Bonner's death (D-2025-006), which identifies Mr. Bonner as "inmate #1" and Defendant Hardin as the facility administrator interviewed, Mr. Bonner "answered yes to having withdrawal symptoms from alcohol/drugs" on intake.

91. Allied recognized that Mr. Bonner required medical attention and scheduled him for a telehealth visit and, upon information and belief, it failed to provide the care it recognized Mr. Bonner needed because of systemic deficiencies caused by understaffing, inadequate training, and the failure to maintain an adequate healthcare delivery system. Defendant Hardin, the Facility's administrator, told the state investigator that Mr. Bonner was "scheduled for a telehealth visit," but Mr. Bonner died before that visit occurred:



92. Allied housed Mr. Bonner alone, in a single-occupant cell, Cell 356 on Floor 3 of the Facility. He had no cellmate to summon help. Whether Mr. Bonner received timely medical attention depended entirely on Facility staff.

93.    Mr. Bonner remained in the Facility from Friday afternoon, February 14, through Monday afternoon, February 17, 2025. During that period he developed acute laryngo-epiglottitis, an infection and inflammation of the epiglottis and surrounding airway structures that progresses over hours and produces observable, worsening symptoms, including wheezing, sore throat, difficulty swallowing, drooling, a muffled or labored voice, audible breathing, and respiratory distress.

94.    Upon information and belief, Mr. Bonner exhibited these obvious and worsening symptoms of respiratory distress for a substantial period before he was found unresponsive. The Facility is equipped with a surveillance system owned and controlled by the City (Agreement § 4.2). Upon information and belief, that system captured Mr. Bonner in visible and audible distress for multiple hours before any staff member bothered to perform an adequate welfare check.

95.    Allied was required to conduct regular welfare checks of detainees, including Mr. Bonner. Upon information and belief, Allied staff either failed to perform the required checks, or performed them so perfunctorily that a man in escalating respiratory distress, alone in a single cell, went unnoticed until he had stopped breathing.

96.    At approximately 3:15 p.m. on February 17, 2025, Facility staff found Mr. Bonner unresponsive in Cell 356. Detention officers, identified in Allied's contemporaneous serious-incident report as D/O Harris, D/O Anthony, Cpl. Redman, and D/O Godsey, began chest compressions and deployed a LifePak defibrillator. Per that report, Mr. Bonner "still showed no signs of response." Upon information and belief, the same detention officer (Anthony) who had processed Mr. Bonner's intake three days earlier was among those who attempted resuscitation.

97.    Emergency responders ultimately placed defibrillator pads on Mr. Bonner's torso and an intraosseous line in his right leg. The interventions came too late. Mr. Bonner was

17

pronounced dead at the Facility at approximately 3:45 p.m. on February 17, 2025, and the Office of the Chief Medical Examiner was notified by the Tulsa Police Department at 4:00 p.m.

98.    The Office of the Chief Medical Examiner determined that Mr. Bonner died of acute laryngo-epiglottitis. The autopsy documented "[e]dema of the epiglottis, vocal cords, and adjacent soft tissues of the larynx," a "[m]ixed inflammatory infiltrate (predominately neutrophilic)," and "[s]loughing of the mucosa with underlying ulcerative-type changes", findings of an established, progressive infection, not a sudden or instantaneous event.

99.    The manner of death was classified as natural. The autopsy found "[n]o lethal trauma," and post-mortem toxicology was "negative for analytes tested." Mr. Bonner did not die of an overdose, an injury, or an allergic reaction. He died of an untreated bacterial infection of the airway.

100.    Acute laryngo-epiglottitis is highly treatable. With timely recognition and ordinary medical intervention, antibiotics and airway management, it is survivable. Had Mr. Bonner received timely medical care for the symptoms he exhibited in his cell and known to Allied staff, he would have survived.

101.    Mr. Bonner's death was not the product of any sudden, unforeseeable event. He was a seriously mentally ill man whom the Facility's staff knew well; whose intake screening flagged a medical need requiring timely care; whom Allied recognized needed care and scheduled for a telehealth visit he did not live to attend; and who then developed an obvious, hours-long medical emergency, alone in a single cell, while the staff responsible for his welfare failed to adequately monitor him, respond, or summon help in time.

102.    Mr. Bonner's death was the direct and foreseeable result of the systemic deficiencies described above: the decision to operate a custodial facility with no on-site medical

18

or mental-health care, chronic understaffing, inadequate training, inadequate medical screening and monitoring, and a corporate culture of indifference to the medical needs of the people in its custody, and retaliation.

## III.

## STATEMENT OF CLAIMS

## <u>Claim 1</u>

**Deliberate indifference to serious medical needs**
**42 U.S.C. § 1983**
**Defendant Allied Universal**
**Systemic deficiency**

103.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

104.    At all relevant times, Allied operated the Facility and provided custodial and intake services to detainees under its Agreement with the City of Tulsa. In doing so, Allied performed a traditional and exclusive public function and acted under color of state law.

105.    As a pretrial detainee who had not been convicted of any offense, Mr. Bonner's right to adequate medical care arose under the Due Process Clause of the Fourteenth Amendment, and was at least as protective as the Eighth Amendment.

106.    Mr. Bonner had an objectively serious medical need. Acute laryngo-epiglottitis is a life-threatening airway infection that produces obvious, worsening symptoms a lay person would recognize as requiring a doctor's attention, as more fully described above, and it was in fact the diagnosed cause of his death.

107.    A private entity that performs a public function under color of state law is liable under § 1983 for its policies, practices, customs, or decisions by a final policymaker that cause a constitutional violation or set in motion a series of events the entity knew would likely result in the deprivation of a constitutional right.

108. Allied adopted, enforced, and maintained policies, practices, or customs that denied adequate medical screening, monitoring, and emergency medical care to detainees at the Facility, with deliberate indifference to the obvious and known risk of serious harm and death, including but not limited to:

(a) a custom of overriding or disregarding the medical-intake criteria set out in Exhibits B and C to the Agreement, including the practice of administrators overruling intake personnel who identified detainees requiring medical attention or diversion;

(b) a policy or directive requiring administrative pre-approval before staff could summon emergency medical transport, which deterred and delayed calls for outside care;

(c) chronic staffing below the minimum levels the Agreement required, leaving detainees unmonitored;

(d) a failure to perform adequate and timely welfare checks of detainees in custody and/or who presented with current and ongoing serious medical needs;

(e) a failure to provide adequate facilities, equipment, and access to adequate medical personnel in a timely fashion and instead relying on remote tele-health services that were not adequate to provide timely interventions for people with objectively serious medical conditions like Mr. Bonner and others; and

(f) a failure to take any corrective action despite repeated in-custody deaths, repeated Oklahoma State Department of Health findings, CLEET citations for unlicensed personnel, prior lawsuits, and repeated employee warnings, all described above.

109.    Allied maintained these policies, practices, and customs with actual knowledge, from the deaths, regulatory findings, lawsuits, and internal complaints alleged above, that they created a substantial risk of serious harm to detainees with medical needs, and Allied consciously disregarded that risk.

110.    Each of these policies, practices, and customs was a moving force behind Mr. Bonner's death. Allied's intake personnel recognized and appreciated Mr. Bonner's medical need and scheduled him for a remote telehealth visit. Nevertheless, its facilities, equipment, staffing and monitoring failures left him alone and unobserved through an hours-long, obvious medical emergency; and its corporate indifference to outside care meant no one summoned the help that would have saved him.

111.    As a direct and proximate result, Mr. Bonner suffered conscious pain and a foreseeable death, and Plaintiff sustained the damages recoverable under Oklahoma's survival and wrongful-death statutes, 12 O.S. §§ 1051–1054. Plaintiff is entitled to compensatory, nominal, and punitive damages against Allied.

## Claim 2

**Deliberate indifference to serious medical needs**
**42 U.S.C. § 1983**
**Defendant Allied**
**Deliberate indifference – failure to train**

112.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

113.    Allied knew to a moral certainty that its detention officers and intake personnel would regularly confront detainees presenting with serious medical and mental-health conditions, including conditions, like acute airway infections, intoxication, and withdrawal, that develop rapidly and require prompt recognition and emergency intervention. The Facility's own intake

21

instruments (Exhibits B and C) and Mr. Bonner's repeated bookings confirm that such encounters were a usual and recurring part of Allied's operation.

114. The need to train Facility staff to competently recognize and timely respond to such medical emergencies was obvious based on these routine and reoccurring encounters with medically compromised persons, and that specific training would enable staff to respond and intervene in a timely manner that would likely prevent a constitutional deprivation. Allied's training was so likely to result in the denial of constitutionally adequate care that Allied's failure to provide it reflects deliberate indifference.

115. More specifically, Allied failed to adequately train its personnel to identify the signs and symptoms of a developing medical emergency, to perform meaningful welfare checks, and to obtain timely emergency medical care for detainees in distress. The pattern of in-custody deaths, regulatory findings, state law obligations, lawsuits, and employee warnings alleged above placed Allied on notice that its training was constitutionally deficient, and Allied did nothing to correct it.

116. To the extent Allied provided any relevant training, that training was generic and not tailored to the specific deficiencies that existed at this facility to functionally operate as no training at all. Training staff to manage a facility operating within lawful parameters does not provide adequate training to manage *this* Facility, which operated with numerous deficiencies that Allied's training ignored, leaving staff to guess or use "common sense" as a substitute for constitutionally adequate training tailored to this facility operating with the deficiencies detailed above.

117. Allied's failure to train was a moving force behind Mr. Bonner's death and the resulting injuries, for which Plaintiff is entitled to compensatory and punitive damages.

## Claim 3

**Deliberate indifference to serious medical needs**
**42 U.S.C. § 1983**
**Defendant Hardin (Allied) – official capacity**
**Final policymaker liability**

118.    Plaintiff adopts and incorporates the preceding paragraphs as if fully set forth herein.

119.    Defendant Hardin was the Allied employee with final unreviewable decision-making authority for day-to-day decisions at the Facility. In that capacity, his actions are the actions of Allied. In the alternative, Allied acquiesced in Hardin's role as final policymaker for the Facility and allowed him to manage and operate the Facility without any meaningful oversight.

120.    Allied, through Hardin, materially deviated from the Agreement and the Oklahoma Jail Standards in a manner that increased the risk of harm to people presented for detention with objectively serious medical needs as more fully set forth above.

121.    For example, Allied, through Hardin, retaliated against employees who identified constitutional deficient procedures, he maintained a custom of overriding intake determinations, he enforced a directive requiring administrative pre-approval before summoning emergency transport, he developed and enforced a system of chronic understaffing and deficient welfare checks, and he personally failed to ensure Mr. Bonner received the medical attention his condition obviously required.

122.    The actions and omissions of Hardin, as Jail Administrator and final policymaker, served as the moving force behind the deprivations suffered by Mr. Bonner as more fully detailed above for which Allied is liable.

**Claim 4**

**Deliberate indifference to serious medical needs**
**42 U.S.C. § 1983**
**Defendant Hardin – individual capacity**
**Individual liability**

123.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

124.    Defendant Hardin was the on-site administrator of the Facility and acted under color of state law. As alleged above, his job duties tracked the Agreement's description of the Facility's final on-site decisionmaker, and he was responsible for the operations, staffing, and policies under which Mr. Bonner was held.

125.    Hardin had actual, subjective knowledge that Mr. Bonner faced a substantial risk of serious harm. Hardin's staff repeatedly booked and processed Mr. Bonner, a seriously mentally ill, unmedicated man, through the Facility in the months before his death. Mr. Bonner's intake screening flagged a medical need, and Hardin himself told the state investigator that Mr. Bonner had been scheduled for a telehealth visit, confirming Hardin's awareness that Mr. Bonner required medical attention.

126.    A custodial official who knows of a detainee's serious medical need and prevents, delays, or fails to facilitate access to the treatment the detainee requires acts with deliberate indifference as a "gatekeeper."

127.    The actions and omissions of Hardin served as the moving force behind the deprivations suffered by Mr. Bonner as more fully detailed above for which Hardin is liable.

## Claim 5

**Deliberate indifference to serious medical needs**
**42 U.S.C. § 1983**
**Defendant Hardin – individual capacity**
**Supervisory liability**

128.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

129.    Knowing of Mr. Bonner's serious medical need and of the systemic failures in his Facility, Hardin nonetheless maintained, directed, or acquiesced in the policies and conditions that denied Mr. Bonner timely care, including the practice of overriding intake determinations, the directive requiring administrative pre-approval before summoning emergency transport, chronic understaffing, and deficient welfare checks, and he personally failed to ensure that Mr. Bonner received the medical attention his condition obviously required.

130.    Hardin is liable in his supervisory capacity. Through his personal adoption of and deliberate indifference to these policies and customs, an affirmative causal link exists between Hardin's conduct and the violation of Mr. Bonner's rights.

131.    Hardin's deliberate indifference was a direct and proximate cause of Mr. Bonner's conscious suffering and death, for which Plaintiff is entitled to compensatory and punitive damages.

## Claim 6

**Deliberate indifference to serious medical needs**
**42 U.S.C. § 1983**
**Defendant John/Jane Does – individual capacity**
**Individual liability**

132.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

133.    The John and Jane Doe Defendants are the Allied detention officers and supervisors responsible for monitoring Mr. Bonner and conducting welfare checks during his confinement

25

from February 14 through February 17, 2025. Their identities are presently unknown to Plaintiff and will be substituted by amendment after discovery of the shift rosters, observation logs, and surveillance records.

134.    During the hours before Mr. Bonner was found unresponsive, he exhibited obvious and worsening signs of respiratory distress while alone in a single-occupant cell. The Doe Defendants either observed Mr. Bonner's obvious distress and disregarded it, or disregarded his serious medical needs and failed to perform the welfare checks that would have revealed it, a failure so substantial, given a detainee visibly and audibly struggling to breathe, as to constitute conscious disregard of a known and obvious risk.

135.    The Doe Defendants' deliberate indifference was a direct and proximate cause of Mr. Bonner's death, for which Plaintiff is entitled to compensatory and punitive damages.

## **Claim 7**

**Deliberate indifference to serious medical needs**
**42 U.S.C. § 1983**
**Defendant City of Tulsa**
**Municipal liability**

136.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

137.    The City of Tulsa owns the Facility and, through the Agreement, retained administration and control over its operation. The City cannot insulate itself from liability for the conditions of confinement at its own lockup by contracting day-to-day operations to a private vendor; its constitutional duty to detainees in its custody is non-delegable.

138.    The City is independently liable under § 1983 on each of the following grounds:

    (a)    Inadequate Policy. The City made a deliberate, affirmative policy decision to operate a custodial facility with no on-site medical or mental-health care, relocating its lockup away from a facility with on-site medical services and

adopting a telehealth-only model, as a cost-saving measure. The City's policymakers made this choice with actual knowledge of, and conscious disregard for, the resulting risk to detainees with medical and mental-health needs, having been expressly warned that the decision would produce increased liability and harm. This policy was a direct cause of the absence of care that killed Mr. Bonner.

(b)     Custom. The City maintained a custom and practice of tolerating systematic medical-intake and monitoring failures at the Facility despite actual notice from repeated in-custody deaths, repeated Oklahoma State Department of Health findings, formal complaints delivered to the City's police command, and direct warnings from facility personnel that detainees with serious medical needs were going without care.

(c)     Failure to supervise the retained function. Having retained administration and control over the Facility through its designated police official, the City failed to act on that retained authority to correct the deadly conditions of which it had actual knowledge, amounting to deliberate indifference.

(d)     Ratification. The City, through its final policymakers, ratified the unconstitutional conduct by investigating each in-custody death through its own police department, consistently finding no wrongdoing, imposing no discipline, and making no corrective change, thereby approving both the conduct and the basis for it.

27

139.    Each of these policies, customs, and failures was deliberately indifferent to the rights of detainees and was a moving force behind the violation of Mr. Bonner's rights and his death.

140.    As a direct and proximate result, Plaintiff sustained the damages for which the City is liable.

### Claim 8

**Negligence**
**Common law**
**Defendant Allied**
**Wrongful death**

141.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

142.    Allied is a private entity and is not a political subdivision or an employee of a political subdivision within the meaning of the Oklahoma Governmental Tort Claims Act; it is therefore not entitled to the immunities that Act affords, including the exemption at 51 O.S. § 155(25).

143.    As the operator of the Facility, a special relationship existed between Allied and Mr. Bonner with Allied owing Mr. Bonner a duty to exercise reasonable care for his safety and to obtain reasonable medical care for his serious medical needs while he was in its custody and dependent upon it.

143.    Allied breached that duty by, among other things, failing to provide adequate staffing, training, medical screening, monitoring, and welfare checks, and by failing to summon timely emergency medical care for Mr. Bonner's obvious and deteriorating condition.

144.    Allied's breaches were a direct and proximate cause of Mr. Bonner's conscious pain and suffering and his death. Plaintiff seeks damages under Oklahoma's survival and wrongful-death statutes, 12 O.S. §§ 1051–1054, including punitive damages.

**Claim 9**

**Negligence**
**Common law**
**Defendant Hardin**
**Wrongful death**

145.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

146.    In his role as the on-site administrator of the Facility operated by Allied, a private contractor, Hardin owed Mr. Bonner a duty to exercise reasonable care for his safety and medical needs. Hardin is not entitled to Governmental Tort Claims Act immunity for the negligent operation of the Facility, which the Act exempts from the City's tort liability and which a private contractor and its administrator cannot claim as their own shield.

147.    Hardin breached that duty by maintaining, directing, or acquiescing in the staffing, screening, monitoring, and emergency-care failures described above, and by failing to ensure that Mr. Bonner received the medical care his condition required.

148.    Hardin's breaches were a direct and proximate cause of Mr. Bonner's conscious pain and suffering and his death, for which Plaintiff seeks damages under 12 O.S. §§ 1051–1054, including punitive damages.

**IV.**

**RELIEF REQUESTED**

149.    Based on the foregoing, Plaintiff respectfully requests the Court enter judgment in its favor and against the Defendants, and award the following relief:

A.    Compensatory damages against all Defendants;

B.    Punitive damages against Defendants Allied Universal and Hardin;

C.    Pre and post-judgment interest;

D.    Reasonable costs and attorney's fees;

29

E.     Any other relief to which Plaintiff may be entitled by law;

F.     Any other relief the Court deems just and equitable.

Respectfully submitted,

BRYAN & TERRILL

By:     *s/J. Spencer Bryan*
Steven J. Terrill, OBA # 20869
J. Spencer Bryan, OBA # 19419
BRYAN & TERRILL LAW, PLLC
2500 S. Broadway, Suite 122
Edmond, OK 73013
Tele/Fax:     (918) 935-2777
Email: sjterrill@bryanterrill.com
Email: jsbryan@bryanterrill.com